UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BRETT MCCARTHY,
Plaintiff,
v.
CITY OF HACKENSACK, RAYMOND
GUIDETTI, MICHAEL ANTISTA, JOHN F.
KNAPP, XYZ CORP. INC. (1-10), JOHN DOES
(1-10), and JANE DOES (1-10)
Defendants.

Case No. 24-cv-10388

OPINION ON MOTION
TO DISMISS

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiff Brett McCarthy, a police officer for the City of Hackensack, New Jersey, brings this action against the City of Hackensack and three of his supervisors: Police Director Raymond Guidetti, Police Chief Michael Antista, and John Knapp. Plaintiff claims that the Defendants retaliated against him after he complained about certain employment conditions and later moved for a vote of no confidence in Guidetti and Antista at a meeting of the Police Benevolent Association Local 9 ("PBA-9"), the collective bargaining unit that represents the City of Hackensack's rank-and-file police officers. Plaintiff's complaint brings three counts against the defendants: first, for deprivation of his federal constitutional rights in violation of the 42 U.S.C. § 1983; second, for violation of his state constitutional rights in violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.*; and third, for conspiring to deprive him of his constitutional rights in violation of 42 U.S. § 1985.

Now before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

**I. FACTS AS ALLEGED**[1]

**A. The ESU Pilot Program**

Plaintiff has been a member of both the City of Hackensack police department and the PBA-9 since January of 2011. Compl. ¶¶ 23-24. In November of 2022, Defendant Guidetti issued a memorandum establishing an application and selection process for officers to apply for specialized assignments in the Police Department. *Id.* ¶ 25. The following month, Defendant Knapp informed Plaintiff that he intended to recommend Plaintiff for participation in a pilot program for the implementation of a new Emergency Services Unit ("ESU"). *Id.* ¶¶ 26-27. Defendant Knapp ran the pilot program. *Id.* ¶ 29. The ESU pilot program operated on a rotation-

---

[1] "In considering a Rule 12(b)(6) motion, courts must accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff[.]" *Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) (citation omitted). This factual summary reflects the Plaintiff's well-pleaded allegations.

1

basis, but officers selected for training in the pilot program were told that they would later be given the opportunity to "try out" for full-time membership in the ESU. *Id.* ¶¶ 31-33. Plaintiff initially participated enthusiastically in the ESU pilot program, but also vocalized his concerns regarding staffing and selection procedures. *Id.* ¶¶ 34-42. In April 2023, Plaintiff (during his personal time) drafted a staffing proposal that he presented to Defendants Guidetti and Antista. *Id.* ¶¶ 43-44.

In September 2023, after the pilot program had been extended multiple times, Defendants Antista and Knapp announced that the pilot program would conclude at the end of 2023. *Id.* ¶ 47. Later that month, Defendant Knapp told Plaintiff that he would be one of the four officers selected to join the ESU as a full-time member. *Id.* ¶ 48. Plaintiff responded that "from a union perspective, there will be an issue because Defendant Knapp advised all twelve (12) of the participants in the program that there would be 'tryouts' and that should be the process in order for everyone to get a fair opportunity." *Id.* ¶ 49. Defendant Knapp moved forward anyway, creating a group message including Plaintiff and the other three officers selected for inclusion in the full-time ESU. *Id.* ¶ 50. On October 8, 2023, the same day that the selected officers were scheduled to assume full-time ESU status, Defendant Knapp informed them that "no final decision was made as to ESU," and that, after meeting with Defendants Guidetti and Antista, the pilot program would remain in place until the end of 2023 as previously scheduled. *Id.* ¶¶ 50-53.

On October 27, 2023, Defendant Guidetti issued a personnel order naming four candidates—not including Plaintiff—to the full-time ESU. *Id.* ¶ 54. Defendant Knapp told Plaintiff that he "had nothing to do with the personnel decision" and that Defendant Guidetti's involvement "corrupted the selection process." *Id.* ¶¶ 55-60. Defendant Knapp advised that all of the officers involved in the pilot program would have the opportunity to serve as backup ESU officers when the full-time members were sick or on leave. *Id.* ¶ 61.

### B. The Union Votes of No Confidence

On or about November 21, 2023, the Police Benevolent Association Local 9A—*i.e.*, the union representing supervisory officers[2]—announced a vote of no confidence in Defendants Guidetti and Antista. Compl. ¶ 64. Plaintiff expressed his support for the Local 9A's vote and told Defendant Knapp and others that he planned to support a similar motion on behalf of the PBA-9. *Id.* ¶ 66. On or about December 13, 2023, at a meeting of the PBA-9, Plaintiff stood up and made a motion for a vote of no confidence in Defendants Guidetti and Antista. *Id.* ¶¶ 71-72. The PBA-9 voted by secret ballot in favor of the vote of no confidence. *Id.* ¶¶ 73-74. Because the vote was taken by secret ballot, Plaintiff and the officer who seconded his motion were the only members of the PBA-9 whose positions on the no-confidence vote were publicly known. *Id.* ¶ 74. Despite the no-confidence votes, the City of Hackensack extended Guidetti's contract as Police Director in December of 2023. *Id.* ¶ 75.

---

[2] Plaintiff did not include in his pleadings that the Local 9A represents supervisory officers, but the Court takes judicial notice of this fact because it is a matter of public record. *See Korotki v. Levenson*, 2021 WL 2650775, at *3 (D.N.J. June 28, 2021) ("Even in a Rule 12(b)(6) posture, where the Court is limited to the allegations plead on the face of the complaint, a court may consider judicially noticeable facts without converting a motion to dismiss into a motion for summary judgment.").

2

The following month, at a Mayor and City Council meeting which Plaintiff attended, Defendant Guidetti publicly responded to the no-confidence votes, and members of the PBA-9 and the Local 9A made comments in support of the no-confidence votes. *Id.* ¶¶ 79-80. At the meeting, Hackensack Mayor John Lambrosse[3] commented that he respected Defendant Guidetti for "getting up in front of what I would call 80 of the enemy," which Plaintiff believes was a reference to himself and other union members. *Id.* ¶¶ 81-83.

### C. Removal from ESU

After the PBA's vote of no confidence, but before the Mayor and City Council meeting, Defendant Knapp approached Plaintiff to check in and see if Plaintiff was upset about his lack of assignment to the ESU. *Id.* ¶ 76. Plaintiff responded by complaining that he was not being given any time to serve on backup ESU service and told Defendant Knapp that he believed the lack of ESU assignments was retaliation for the vote of no confidence. *Id.* ¶ 77.

On or around February 5, 2024, Plaintiff arrived to ESU training but did not bring a rifle that he needed for training—Plaintiff asserts that in the past one individual had been assigned to rifles for the group, but this time nobody retrieved his. *Id.* ¶¶ 84-87. Plaintiff believes that one of the officers told Defendant Knapp that he had intentionally failed to retrieve Plaintiff's gun and that Defendant Knapp and others laughed in response. *Id.* ¶¶ 88-91.

On February 6, 2024, Plaintiff overslept and missed ESU training. *Id.* ¶¶ 98-99. Plaintiff alleges that he overslept because of well-known mental health problems and because of harassment and retaliation by the Defendants. *Id.* ¶¶ 93-98. When he called Defendant Knapp to inform him that he had overslept, Defendant Knapp told him not to come for training at all, and Plaintiff called in sick for the rest of the day. *Id.* ¶¶ 99-101. Plaintiff then received a call from a Sergeant at the police department who told him that Defendant Knapp wanted him to check in on Plaintiff. *Id.* ¶¶ 103-104. Then one of the ESU officers removed Plaintiff from the WhatsApp group message that the unit used to communicate with each other. *Id.* ¶ 115. Plaintiff complained to Defendant Knapp and Defendant Antista that he was being retaliated against and asked to remain on the ESU and be added back to the WhatsApp channel, and Defendants told Plaintiff he could remain on the unit. *Id.* ¶¶ 116-118. But Plaintiff was never added back to the WhatsApp channel, and as a result, he repeatedly missed ESU trainings in March and April of 2024. *Id.* ¶¶ 120-124. Plaintiff complained and reiterated his retaliation allegations to Defendants Knapp and Antista. *Id.* ¶¶ 125-130. In April 2024, Defendant Knapp, with Defendants Guidetti and Antista's approval, formally removed Plaintiff from the ESU. *Id.* ¶¶ 129-132.

### D. Procedural History

Plaintiff filed the operative complaint on October 18, 2024 in in the Superior Court of New Jersey, Bergen County. ECF No. 1 ¶ 1. Defendants acknowledged service on November 8, 2024 and filed their notice of removal the same day. *Id.* ¶ 2. On November 27, 2024, Defendants filed their motion to dismiss for failure to state a claim upon which relief can be granted. ECF No. 4. Plaintiff filed his opposition on December 19, 2024, and Defendants filed their reply on December 30, 2024.

---

[3] Plaintiff refers to Lambrosse as "Defendant Lambrosse" in his complaint, but Lambrosse is not named as a defendant.

3

## II.   MOTION TO DISMISS STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint where the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal is appropriate only if, accepting all of Plaintiff's well-pleaded allegations as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint needs not contain detailed factual allegations, but must at least "provide the 'grounds' of his 'entitlement to relief,'" requiring "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action[.]" *Twombly*, 550 U.S. at 555 (citation omitted). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, *see id.* at 570, such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

## III.   DISCUSSION

Plaintiff brings three claims: (1) retaliation in violation of his rights to free speech and association as protected by the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983; (2) retaliation in violation of the rights to free speech and association as protected by the New Jersey Constitution and the New Jersey Civil Rights Act, N.J.S.A. § 10:6-1 *et seq.* ("NJCRA"); and (3) conspiracy to violate his civil rights in violation of 42 U.S.C. § 1985.[4] "The Free Speech Clause contained within the New Jersey Constitution 'is generally interpreted as co-extensive with the First Amendment,'" so the analysis of McCarthy's NJCRA claim is "identical to its federal counterpart." *Palardy v. Twp. Of Millburn*, 906 F.3d 76, 80 (3d Cir. 2018) (citing *Twp. Of Pennsauken v. Schad*, 160 N.J. 156 (1999)).

Defendants argue that Plaintiff's claims fail because his complaint lacks well-pleaded allegations of speech, *see* Mot. at 13-15; that Plaintiff failed to allege conduct protected by the right to free association, Mot. at 15-18; that, if he did allege speech, it was not speech protected by the First Amendment, Mot. at 18-23; that Plaintiff failed to allege retaliatory conduct, Mot. at 23-26; and that Defendants Guidetti, Antista, and Knapp are entitled to qualified immunity, Mot. at 26-30. They also argue principally in their reply brief, Reply at 7, that Plaintiff's § 1985(3) claim should be dismissed for failure to allege discriminatory animus.[5]

---

[4] Plaintiff argues in his Opposition that he adequately pleaded a procedural due process claim, ECF No. 6 at 11-13. As Defendants point out in Reply, Plaintiff's Complaint brings no such claim, so the Court needs not address the parties' arguments.

[5] Though this argument ordinarily would have been waived as Defendants did not raise the issue in their moving brief, because Plaintiff independently raised the issue in his Opposition, Defendants were permitted to respond. *See Elizabethtown Water Co. v. Hartford Cas. Ins. Co.*, 998 F. Supp. 447, 458 (D.N.J. 1998) ("It is axiomatic that reply briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent

4

### A. Counts I and II (Retaliation under § 1983 and NJCRA)

"To prevail on a § 1983 First Amendment retaliation claim, the plaintiff must prove that (1) he engaged in 'constitutionally protected conduct,' (2) the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights,' and (3) 'a causal link [existed] between the constitutionally protected conduct and the retaliatory action.'" *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80 (3d Cir. 2018) (quoting *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)). The first of these considerations requires a legal determination, where the latter two are based in fact. *Baloga v. Pittson Area Sch. Dist.*, 927 F.3d 742, 752 n.7 (3d Cir. 2019).

#### 1. Constitutionally Protected Conduct

In evaluating an action brought under § 1983, "the first step is to identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998). Though not pled as separate claims, Plaintiff alleges that Defendants violated two separate First Amendment rights: his right to freedom of speech and his right to freedom of association. *See* Compl. ¶¶ 134, 145. "Insofar as workplace speech is concerned, the Supreme Court has long held that public employees only receive First Amendment protection from retaliation in the workplace when they speak out on a matter of public concern and their interest in speaking outweighs the government's interest in promoting workplace efficiency and avoiding disruption." *Palardy*, 906 F.3d at 81 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). But where, as here,

> a public employee asserts retaliation in violation of the First Amendment as a free speech claim and a pure union association claim, those claims must be analyzed separately, and consistent with longstanding Supreme Court precedent, there is no need to make a separate showing of public concern for a pure union association claim because membership in a public union "is always a matter of public concern."

*Baloga*, 927 F.3d at 748-49 (quoting *Palardy*, 906 F.3d at 80-81). Recognizing this distinction, the Court first considers plaintiff's pure-speech allegations, and then assesses the association allegation.

##### i. *Pure Speech Allegations*

"Though the First Amendment provides robust protection to statements pertaining to matters of public concern, it does not empower public employees to 'constitutionalize the employee grievance.'" *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 244 (3d Cir. 2016) (quoting *Connick*, 461 U.S. 138 at 154). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

---

has refuted." (emphasis added)); *see also Crystal IS, Inc. v. Nitride Semiconductors Co., Ltd.*, 2023 WL 2726702, at n.5 (N.D.N.Y. March 31, 2023) (collecting cases).

5

Setting aside for a moment Plaintiff's allegations concerning his union action moving for a vote of no confidence in his supervisors, the following allegations could arguably underpin his speech retaliation claims:[6]

- "On the first day of training, Plaintiff advised Defendant Knapp, and the other supervisors present, that the Department needed to allow all officers to apply and create a selection process for the unit." Compl. ¶ 34;

- "In response to Defendant Guidetti's question to the officers if there were any issues, Plaintiff answered that there were on-going challenges and confusion with patrol supervisors regarding what ESU officers' responsibilities were on their assigned days." Compl. ¶ 39;

- Plaintiff drafted "a proposal for Defendants Guidetti and Antista, which he submitted to them on April 23, 2023." Compl. ¶ 43;

- "Plaintiff advised Defendant Knapp that, from a union perspective, there will be an issue because Defendant Knapp advised all twelve (12) of the participants in the program that there would be 'tryouts' and that should be the process in order for everyone to get a fair opportunity." Compl. ¶ 49.

Defendants argue that these allegations are not sufficiently detailed to constitute allegations of speech. Mot. at 14-15. That is not quite right. These *are* well-pleaded allegations of speech—they are more than the mere "labels and conclusions" that *Twombly* and *Iqbal* warn against.

However, these instances of speech are not examples of *protected* speech, because each occurrence is best characterized as a private employee grievance made pursuant to the Plaintiff's execution of his job responsibilities. This situation is analogous to the speech at issue in *Fraternal Order of Police, Lodge 1 v. City of Camden*, where the Third Circuit held that plaintiff-officers' comments written on internal police counseling forms did not constitute protected citizen speech because "Citizens do not complete internal police counseling forms. Rather, completing counseling forms as a part of the police disciplinary process falls under officers' official duties." 842 F.3d at 244. The same is true of Plaintiff's complaints and policy proposals, submitted to his supervisors for their consideration in the execution of their job responsibilities, concerning staffing and selection procedures, all of which are part and parcel of his role as a police department employee. To the extent that Plaintiff seeks to pursue a pure speech claim, that claim fails.

        ii.    *Associational Claim*

---

[6] Most of the other instances of speech alleged in Plaintiff's complaint are coextensive with Plaintiff's association claim. Compl. ¶¶ 66, 72, 77, 80, 103, 106, 109, 110, 115, 127 (*see infra* A.1.ii). These allegations do not give rise to a freestanding speech claim because they are "co-extensive with [Plaintiff's] associational claim." *See Palardy*, 906 F.3d at 84. Plaintiff's only other allegation of speech—that he "speaks openly about [mental health awareness] in an attempt to eliminate a stigma associated with mental health issues for officers," Compl. ¶¶ 95-96—does not form the basis of his retaliation allegation, *see* Opp. at 5-11, ECF No. 6.

6

Plaintiff's core associational claim is that Defendants retaliated against him for his motion, at a union meeting, for a vote of no confidence in Defendants Guidetti and Antista as leaders of the police department. Whether a motion for a vote of no confidence is better characterized as a pure associational claim (such that the public concern requirement is inapplicable) or as a speech claim is a close question, but is resolved by applying the Third Circuit's rationale in *Baloga v. Pittson Area School District*, 927 F.3d 742 (3d Cir. 2019):

> Although we spoke in *Palardy* primarily about union "membership," our recognition of the public concern inherent in union membership applies with particular force to union leaders, for the right of union membership "would be meaningless unless an employee's right to participate in union activities were also recognized." *Roberts v. Van Buren Pub. Sch.*, 773 F.2d 949, 957 (8th Cir. 1985) (citations omitted). As we said long ago, "[p]lainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." *Labov v. Lalley*, 809 F.2d 220, 222-23 (3d Cir. 1987); *see also [Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 464 (1979)] ("The First Amendment ... protects the right of associations to engage in advocacy on behalf of their members."). And because a union's ability to file grievances on behalf of its members is essential to its collective bargaining power, *see Morgin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1439 (10th Cir. 1990), **retaliation against a union leader for the union's decision to file a grievance—as distinct from retaliation based on the substance of the grievance—constitutes retaliation based on association rather than on speech per se[.]**"

*Id.* (emphasis added).

Applying *Baloga*'s reasoning to the facts alleged, it appears that Plaintiff presses a pure associational claim, alleging that he was retaliated against for moving for a vote of no confidence in leadership, not because of the substance or rationale for the motion. While Plaintiff does not allege that he is a union leader in any official capacity, his role in leading the PBA-9's no-confidence motion is a clear example of an "effort[] of public employees to associate together for the purpose of collective bargaining." *Labov*, 809 F.2d at 222-23 (3d Cir. 1987). Indeed, Plaintiff does not actually indicate in his Complaint what he *said* in making or advocating his motion—only that he made the motion and that the PBA-9 voted by secret ballot to approve the motion. "Thus, the right at issue is a public employee's right not to be subjected to adverse treatment for his leadership role in a public union—not, as Defendants contend, for the content of the" motion. *Baloga*, 927 F.3d at 762.

But even if the *Garcetti/Connick/Pickering* requirements did apply to Plaintiff's no-confidence motion, Defendants' arguments for dismissal would still fail.

First, Plaintiff's union actions were taken as a citizen, not as an employee. Defendants argue that "any speech offered by Plaintiff here occurred solely because he is a police officer.... Plaintiff was able and eager to speak out about his belief that Defendant Guidetti was wrong for the Police Department precisely because of his employment as a police officer and the special

7

knowledge and experience acquired through his employment." Mot. at 20 (citing *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231 (3d Cir. 2016)). This is the wrong standard. It is true "that a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job," *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009), but it is also true that "the First Amendment protects speech by employees who are 'the members of a community most likely to have informed and definite opinions' on issues of public concern related to their job," *Jerri v. Harran*, 625 Fed. App'x 574, 579 (3d Cir. 2015) (citing *Pickering*, 391 U.S. at 572). "[W]hether an employee's speech concerns the subject matter of his employment is nondispositive under *Garcetti*... because the First Amendment necessarily protects some expressions related to the speaker's job." *Dougherty v. School Dist. Of Philadelphia*, 772 F.3d 979, 989 (3d Cir. 2014) (cleaned up); *see also Lane v. Franks*, 573 U.S. 228, 239 ("The *Garcetti* Court held that [] speech was made pursuant to the employee's 'official responsibilities' because '[w]hen [the employee] went to work and performed the tasks he was paid to perform, [he] acted as a government employee. ... But *Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment."). Speaking out against his supervisors is clearly not part of Plaintiff's "official responsibilities." *See Jerri*, 625 Fed. App'x at 581 ("Quite simply, there is no record evidence (and it would seem illogical) to suggest that Jerri, Sr. was expected to make the complaints he did to reporters and law enforcement, and thus Jerri, Sr. spoke as a citizen when he complained about the boat business to all and sundry.").

And second, the union's level of confidence in the supervisors of the local police department is a matter of public concern. "The Supreme Court has explained that speech relates to a matter of public concern when it can be fairly considered as relating to any matter of political, social or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Munroe v. Central Bucks School Dist.*, 805 F.3d 454, 467 (3d Cir. 2015) (cleaned up). Plaintiff's motion, and the union's subsequent vote, that Hackensack police officers lack confidence in the leadership of the police department is plausibly a matter of general concern to the community (as it implicates public safety), and moreover, was the subject of legitimate news interest, *see* Megan Burrow, Hackensack Officers Express No Confidence In Police Director As City Extends His Contract, NorthJersey.com, Dec. 15, 2023.[7]

Plaintiff has adequately pleaded that he engaged in protected First Amendment conduct by alleging that he moved for a union vote of no confidence in leadership.

2. Adverse Action and Causation

---

[7] Defendants' comparison of the no-confidence motion to the survey circulated in *Connick v. Myers* misunderstands that case as standing for the principle that a lack of confidence in supervisors is *de facto* not a matter of public concern. But in *Connick*, the Court observed that "Myers did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo." *Connick*, 461 U.S. at 148. Not so here, where Plaintiff's motion for a vote of no confidence was intended to express collective disapproval from the full membership of the union in the quality of leadership, and was quickly made public.

8

As to the fact-based elements of the retaliation claims, Plaintiff has satisfied his pleading burden. First, regarding the adverse action element, "[a]lthough the nature of the retaliatory acts committed by the public employer must be more than *de minimis*, amounting to more than criticism, false accusations, or verbal reprimands, the threshold is very low." *Baloga*, 927 F.3d at 758 (cleaned up). "Indeed, [the Third Circuit has] observed that 'an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her' First Amendment rights may suffice." *Id.* (quoting *Suppan v. Dadonna*, 203 F.3d 228 (3d Cir. 2000)). Here, Plaintiff identifies a handful of different adverse employment actions which he claims were undertaken in retaliation for his protected First Amendment activities. The Court is not persuaded that the extension of Defendant Guidetti's contract can reasonably be viewed as retaliatory action. *See* Compl. ¶ 75. But his other alleged forms of retaliation—namely, that he was "removed from the ESU, denied training opportunities/advancement, and deni[ed] overtime," Compl. ¶ 131—are sufficient to state a claim.

With respect to causation, Plaintiff must plead—and ultimately prove—"either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing." *Price v. City of Philadelphia*, 239 F. Supp. 3d 876, 890 (E.D. Pa. 2017) (quoting *Lauren W. v. Delaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Here, Plaintiff's Complaint indicates that—after being advised that he was likely to "get a lot of overtime in the Emergency Services Unit" in late October or November of 2023, Compl. ¶ 62—Plaintiff voiced his intention to support a vote of no confidence in his supervisors, made the motion, complained that he was not getting the truck time with the ESU that he anticipated, and was ultimately informed that he would not be selected to the unit at all by April of 2024, while at the same time facing at least episodic ridicule from his fellow officers and Defendant Knapp (*see* Compl. ¶¶ 85-92). For the purpose of surviving a motion to dismiss, this contemporaneous combination of protected activity and adverse actions is sufficient to plead causation. Defendants argue that "each of the actions Plaintiff labels as 'retaliatory' were managerial decisions made by the City of Hackensack to promote public safety and the efficiency of the Hackensack Police Department." Mot. at 25. That may well be true. But the Court is not prepared to resolve that factual dispute in Defendants' favor at this early stage of the litigation.

### B. Count III (42 U.S.C. § 1985(3))

To state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006). "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The Supreme Court has considered and expressly rejected the application of § 1985(3) to classes defined by union membership:

9

> [I]f anti-union, anti-nonunion, or anti-employer biases represent the kinds of animus that trigger § 1985(3), there would be little basis for concluding that the statute did not provide a cause of action in a variety of other situations where one economic group is pitted against another, each having the intent of injuring or destroying the economic health of the other. We think that such a construction of the statute, which is at best only arguable and surely not compelled by either its language or legislative history, should be eschewed and that group actions generally resting on economic motivations should be deemed beyond the reach of § 1985(3).

*United Broth. of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 837-39 (1983); *see also Lyak v. City of Hackensack*, 2024 WL 2181134 at *4 (D.N.J. May 15, 2024). Plaintiff's § 1985(3) claim therefore fails.

### C. Qualified Immunity

Defendants Guidetti, Antista, and Knapp (the "Individual Defendants") assert a qualified immunity defense.[8] "Qualified immunity 'shields governmental officials from suit and from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Montemuro v. Jim Thorpe Area Sch. Dist.*, 99 F.4th 639, 641-42 (3d Cir. 2024) (quoting *Mack v. Yost*, 63 F.4th 211, 221 (3d Cir. 2023) (internal citation omitted)). "There is a well-settled two-part test to determine whether government officials should receive qualified immunity.... We ask whether the plaintiff has alleged the violation of any constitutional or statutory rights, and we further ask whether those rights were clearly established at the time of the challenged conduct, such that a reasonable official would have known that the conduct violated the plaintiff's rights." *Montemuro*, 99 F.4th at 642 (citing *Anglemeyer v. Ammons*, 92 F.4th 184, 188 (3d Cir. 2024)).

The Individual Defendants bear the burden of establishing their entitlement to qualified immunity. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). Having determined *supra* that Plaintiff has stated a claim for a First Amendment violation, the inquiry reduces to whether a reasonable official would have known that the alleged conduct violated the plaintiff's rights. At this stage, the Individual Defendants have not carried their burden of establishing their entitlement to qualified immunity.

Other than their insistence that the Court resolve the qualified immunity question as early as possible, Defendants' principal qualified immunity arguments are that "Plaintiff's allegations do not rise to a level that would even suggest Defendants interfered with the Union's ability to organize and communicate" and that Defendants "at all times, acted according to the facts and circumstances within their knowledge and of which they had reasonably trustworthy information sufficient to warrant a prudent man in believing their decisions to renew Guidetti's employment contract and select certain officers for the ESU were appropriate and proper." Reply at 9, ECF No. 7. Neither of these arguments is responsive to the question of whether Defendants' alleged

---

[8] Defendant City of Hackensack does not (and cannot) seek to assert a qualified immunity defense. *See Barna v. Bd. of Sch. Dirs. Of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017).

10

constitutional violation pertained to an established right of which a reasonable official would be aware.

And while it may be difficult to distinguish whether Plaintiff's protected conduct was the exercise of his freedom of association or freedom of speech, as discussed above, under either framework Plaintiff's conduct was clearly protected. *See Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 762 (3d Cir. 2019) ("The Supreme Court has long recognized the right to become a member of a union and the attendant right not to be penalized for that membership."); *Labov v. Lalley*, 809 F.2d 220, 222 (3d Cir. 1987) ("Plainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action."); *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1439 ("The unconstitutionality of retaliating against an employee for participating in a union [is] clearly established ...."); *Mrazek v. Stafford Twp.*, 2017 WL 1788655 (D.N.J. May 5, 2017) ("In sum, clearly established law provides a public employee the right to join a union and prohibits retaliatory employment action—such as passing over a public employee for a promotion—for exercising his or her First Amendment right to associate. To hold otherwise would render the right to join a union a hollow exercise.").

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **DENIED** with respect to Counts I and II of the Amended Complaint, and **GRANTED** with respect to Count III.

An appropriate order follows.

March 4ᵗʰ, 2025

WILLIAM J. MARTINI, U.S.D.J.